UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Not for Publication

|  |  |
|---|---|
| In re: | Chapter 7 |
| VICKIE LYNETTE WILLIAMS, | Case No. 14-10838 (MEW) |
| Debtor. |  |
| NAT VAUGHN, |  |
| Plaintiff, |  |
| v. | Adv. Pro. No. 15-1103 (MEW) |
| VICKIE LYNETTE WILLIAMS, |  |
| Defendant. |  |

**MEMORANDUM DECISION, AFTER TRIAL, GRANTING DEBTOR A DISCHARGE AND OVERRULING OBJECTIONS TO THE DISCHARGEABILITY OF A DEBT**

A P P E A R A N C E S:

NAT VAUGHN
*Pro Se*
175 W. 90th Street, Apt. # 20D
New York, New York

LAW OFFICE OF JULIO E. PORTILLA, P.C.
*Attorney for the Debtor*
111 Broadway, Suite 706
New York, NY 10006
    By:   Julio E. Portilla, Esq..

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

*Procedural Background*

On March 27, 2014, Vicki Lynette Williams (the "Debtor") filed a bankruptcy petition under chapter 13 of the Bankruptcy Code. [Bkr. Case No. 14-10838, Dkt. No. 1][1] On April 8, 2014, Nat Vaughn, a/k/a Nathaniel Vaughn ("Mr. Vaughn"), filed a proof of claim in the Debtor's case in the amount of $4,204.50, indicating that it was for "money loaned." [Claims Register for Case. No. 14-10838, Claim No. 3-1] In support of the proof of claim, Mr. Vaughn attached a copy of a judgment (the "2013 Judgment") that had been issued on March 28, 2013 by the Small Claims part of the Civil Court of the City of New York, for $4,204.50, comprised of a judgment award amount of $4,000, plus $184.50 in interest, and $20 in disbursements. The 2013 Judgment was issued against both the Debtor and her business, Victoria Strands Inc., jointly and severally.

On September 29, 2014, at the Debtor's request, the case was converted to one under chapter 7 [Dkt. No. 19], and on October 8, 2014, a chapter 7 trustee was appointed. [Dkt. No. 22] Notice (the "Notice") of the chapter 7 case and the scheduling of a section 341 meeting of creditors was provided to creditors, including Mr. Vaughn, who was served by first class mail on October 10, 2014. [Dkt. No. 24]. The Notice informed recipients, among other things, that the section 341 meeting of creditors was scheduled for November 5, 2014 and that the deadline (the "Discharge Objection Deadline") for objection to the Debtor's discharge or to challenge dischargeability of certain debts was January 5, 2015. On December 30, 2014, a few days prior to the Deadline, Mr. Vaughn made a submission (the "December Submission") entitled "Objection to the Debtor's Discharge of the Unsecured Debt." [Dkt. No. 30].

On January 7, 2015, because of Mr. Vaughn's status as a *pro se* litigant and in light of the

---

[1] Hereinafter, "Dkt No. ___" refers to docket entries in the main bankruptcy case, no. 14-10138; "Adv. Pro. Dkt. No. ___" refers to docket entries in the adversary proceeding, Adv. No. 15-1103; "PX ___" refers to the Plaintiff's exhibits at trial; and "DX___" refers to the Defendant's exhibits at trial.

2

Discharge Objection Deadline, Judge Gropper entered an order (the "January 2015 Order") scheduling a pre-trial conference on the matter, noting that "[a]lthough the allegations are unclear, since the document was filed *pro se*, the Court will deem it an application to deny the Debtor a discharge or to declare the Creditor's debt nondischargeable." The January 2015 Order indicated that, after the conference, the Debtor would be afforded an opportunity to object to the relief sought by Mr. Vaughn.

At a conference held before this Court on March 19, 2015,[2] Mr. Vaughn was informed that while the December Submission would be construed as a timely filed adversary proceeding, there remained the requirement of paying the adversary proceeding filing fee. He was also cautioned as to whether he would want to incur the cost of pursuing the action in light of the standards that would have to be met to sustain his objections. On April 3, 2015, the Debtor filed an objection to the relief sought by Mr. Vaughn. [Dkt. No. 37]. A further pre-trial conference was held on April 9, 2015, at which Mr. Vaughn was again informed of the standards that would apply to his challenge to the discharge of the debt owed to him. Mr. Vaughn persisted and indicated that he was prepared to file further papers. The Court set a deadline of May 11, 2015 for the filing of any further papers and stated that it would treat any such submission as an amendment to the adversary proceeding.

Prior to the deadline, on May 1, 2015, Mr. Vaughn filed a complaint (the "Complaint") [Adv. Pro. Dkt. No. 1] and was assigned the above-captioned adversary proceeding number. The Complaint set forth two claims for relief: the first sought to have his claim as detailed in his proof of claim "declared to be a valid and allowed claim in this case," and the second claim sought to have that claim "declared to be [a] non-dischargeable debt pursuant to, *inter alia*, § 523(a)(2) and

---

[2] On January 9, 2015, Judge Gropper retired, and the case was reassigned to this Court.

3

(6) of the Bankruptcy Code."[3]   Mr. Vaughn also sought an award of $4,652.52 and "such other and further relief as the Court deems just and proper."[4]   Although the only Bankruptcy Code section mentioned in the claims for relief is 523(a)(2), in the body of the Complaint, Mr. Vaughn alleges substantial abuse under section 707(b) of the Bankruptcy Code.   In addition, Mr. Vaughn alleges that the Debtor provided false testimony to the chapter 7 Trustee or concealed information from her during the section 341 meeting of creditors [*see e.g.*, Complaint ¶¶ 29-31, 44, 48 & 50], and that withholding pertinent information from the chapter 7 trustee "automatically disqualifies the Debtor for any Chapter 7 discharge relief."   [Complaint ¶ 31]   These allegations concerning concealment and false testimony presumably relate to section 727(a)(2) & (a)(4)(A) of the Bankruptcy Code, although in a later paragraph of the Complaint, Mr. Vaughn appears to limit the allegations to the dischargeability of his particular debt.

A final pre-trial conference was held on May 19, 2015, at which a trial date was set.   The trial commenced on June 17, 2015, and continued and concluded on June 29, 2015.

*The Debt Owed to Mr. Vaughn*

The $4,204.50 judgement issued by the Civil Court of the City of New York arises from a $5,000 loan that Vaughn made to the Debtor on September 24, 2012.   On that date, the Debtor signed a "Loan Agreement" in which she agreed to pay Mr. Vaughn the sum of $5,000 within 30 days.   [PX A]   The Loan Agreement further specified that, if the amount was not paid within 30 days, the Debtor gave permission for Mr. Vaughn "to begin withdrawing the unpaid $5,000.00

---

[3] Mr. Vaughn's first claim for relief sought to have his claim "declared to be a valid and allowed claim in this case.   Pursuant to section 502(a) of the Bankruptcy Code, unless objected to by a party in interest, a claim for which a proof of claim has been filed is deemed allowed.   No objection was filed and this claim will be dismissed.

[4] The $4,652.52 amount that Mr. Vaughn listed in the Complaint is the same amount that the Debtor attributed to his claim in the schedule for non-priority unsecured claims included in her bankruptcy petition.

4

from [her] Chase Bank Account" and it specified the number of the bank account. Although there was a blank space provided for her to write in her bank "pin number" for him to use for any withdrawal purpose, that blank was not filled in. The "Loan Agreement" was signed by the Debtor and Mr. Vaughn.

At the trial, the Debtor testified that, on the day of the Loan Agreement, rather than giving the money to her, Mr. Vaughn himself deposited the $5,000 in the Debtor's Chase Bank Account, using the bank account information that she had provided to him. [PX A-1]. The Debtor further testified that she used the funds exactly as she had said she would - - to pay her rent arrearage.

The parties agree that on the October 24, 2012 due date of the loan, the Debtor only offered to pay $1,000 of the amount owing, which Mr. Vaughn maintains he accepted under protest. Their respective accounts of what transpired next differ. Mr. Vaughn asserts that the Debtor indicated that she would pay the remaining $4,000 balance two days later on October 26, 2012; however, instead of paying him on that date, she informed him by telephone that she was away on business in Detroit. Thereafter, when payment was not forthcoming, he commenced the state court proceeding, and obtained the 2013 Judgment. According to the Debtor's testimony at trial, her recollection of what happened was that, upon paying the $1,000, she told Mr. Vaughn that she would try to get him the money as soon as she could. After she did not pay him immediately, he commenced the state court proceeding.

In the state court proceeding, the parties were first referred to mediation, at which the Debtor acknowledged the debt and offered to pay Mr. Vaughn $200 per month. Mr. Vaughn did not accept the offer, saying that he wanted all of the money immediately. The parties then appeared before a judge, and ultimately the 2013 Judgment was issued.

5

*The Debtor's Rental Units and Business*

The Debtor is a hairstylist, who formerly operated a business under the name Victoria Strands, Inc., and now works freelance as a hairstylist, specializing in hair extensions. The Debtor was a tenant with respect to two rental units, 2F and 3R, in the same building on the upper west side of Manhattan; unit 2F was commercial space, out of which she operated her business, and unit 3R was her residence. Prior to entering into the Loan Agreement, the Debtor had discussed aspects of her business operation with Mr. Vaughn and he visited the business location, however, no evidence was offered that the Debtor made any written representations with respect to her financial condition or that of her business.[5] The Debtor's business continued to decline, and as a result of failure to pay rent, in the summer of 2013, her landlord commenced non-payment proceedings (the "Tenant Non-payment Proceedings").

On November 23, 2013, the Debtor commenced an action in New York Supreme Court against her landlord for $500,000 based upon, *inter alia*, breach of contract and negligence, primarily relating to water damage and mold issues (the "Damage Action"). At the time she filed her petition, the Damage Action was pending and the Debtor listed it on Schedule B with an unknown value.

In connection with the Tenant Non-payment Proceedings, on March 5, 2014, the Debtor entered into two stipulations of settlement. The first stipulation, dated March 5, 2014, concerned the commercial unit 2F [DX 2], and pursuant to it, the Debtor was to vacate unit 2F in March 2014. The second stipulation, also dated March 5, 2014, concerned the residential unit 3R [DX 3], it adjourned the matter for trial to a later date in March and required that access to the apartment be

---

[5] This entire process took three days; they first met on a Sunday, he visited the business premises Monday, and made the loan on Tuesday.

6

afforded to the landlord that week to repair leaks and mold related issues. The Debtor vacated unit 2F in March 2014 but continued to occupy unit 3R. The Damage Action, however, remains pending.

The Debtor testified that, because she provides a confidential, professional service for hair loss clients, she was able to continue working directly with certain individual clients on a freelance basis even after she lost commercial space and her salon closed in March 2014. However, because she was not permitted to work from her residential unit, she did not advertise for new business and her client base was limited.

*The New Jersey Property*

On her bankruptcy petition, the Debtor listed property located in New Jersey as her former residence with a value of $291,307.00, and indicated that the secured claim against the property exceeds the value of the property. [Dkt. No. 1]. The Debtor subsequently filed an appraisal report as of October 29, 2013, which values the property at $150,000.00 [Dkt. No. 37, Ex. 4]. The Debtor is listed on the Deed to the property with her ex-husband. [DX 6]. The mortgage, dated March 20, 2012 (the "Mortgage") (the "Mortgage"), pursuant to which the New Jersey property secures a loan made by Bank of America, was signed by the Debtor and her ex-husband.[6] [PX S], The Mortgage refers to a promissory note, dated March 20, 2012, "signed by Borrower" that "states that Borrower owes Lender" $343,500.00. The Borrower is defined in the Mortgage itself as "CRAIG EUSTON, AN UNMARRIED MAN, AND VICKIE WILLIAMS, AN UNMARRIED WOMAN." However, the promissory note was not offered as evidence. The Debtor provided a copy of a Bank of America May 14, 2015 home loan account statement, addressed solely to Mr. Craig Euston, showing a principal balance on the home loan account as of that date of

---

[6] The divorce was finalized on January 22, 2013. [PX P]

7

Pg 8 of 20

$325,582.87, with 26 years and 11 months remaining on the term of a 30-year conventional loan. [DX 7]   Whether the New Jersey property is valued at $291,307.00, as set forth in Schedule "B" or the $150,000 appraisal value, the Debtor does not have any equity in the property.

*Section 523(a)*

As set forth in the May 1, 2015 Complaint, Mr. Vaughn seeks a determination, pursuant to section 523(a)(2) & (6), of the dischargeability of the debt owed to him.   Section 523(a)(2) of the Bankruptcy Code provides, in relevant part, that "[a] discharge under 727 . . . of this title does not discharge an individual debtor from any debt—

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> >
> > (B) use of a statement in writing –
> > (i)    that is materially false;
> > (ii)   respecting the debtor's or an insider's financial condition;
> > (iii)  on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
> > (iv)   that the debtor caused to be made or published with intent to deceive. . .

Mr. Vaughn does not reference any writing that was used by the Debtor to obtain the loan from him, therefore, he can rely only on Section 523(a)(2)(A).

*Section 523(a)(2)(A)*

To except a debt from discharge under § 523(a)(2)(A), five elements must be established:

(1) the debtor made a representation;
(2) the debtor knew the representation was false at the time it was made;
(3) the representation was made with the intent to deceive the creditor;
(4) the creditor relied on the representation; and
(5) the creditor was injured by the representation and suffered damages as a result.

*Kuper v. Spar (In re Spar)*, 176 B.R. 321, 326 (Bankr. S.D.N.Y. 1994).

To preserve an honest debtor's right to a discharge and a fresh start, exceptions to discharge are strictly construed against the creditor. *Kuper v. Spar (In re Spar)*, 176 B.R. 321, 326 (Bankr. S.D.N.Y.1994); *Syncom Indus., Inc. v. Wood (In re Wood)*, 488 B.R. 265, 273 (Bankr. S.D.N.Y. 2013). Each of the required elements must be established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). However, once a creditor has established a prima facie case under Code § 523(a)(2)(A), the debtor then has the burden of going forward with her defense. *Spar*, 176 B.R. at 326.

The representation must have included statements that, when made, "falsely purport[ed] to depict [then] current or past facts. . . A promise to perform in the future is insufficient. . . . ." *Id*. at 327 (citation omitted)  Thus, "representations as to opinion, expectation or declarations of intention do not relate to existing fact and are not actionable" unless the debtor actually "does not hold these opinions or utters them with reckless indifference for their truth." *Id*. "When, at the time a representation is made, the debtor has no intention of performing as promised, a debtor's misrepresentation of his intentions will constitute a false representation under Code § 523(a)(2)(A)." *Id*. Fraud is not proven solely by nonperformance. *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999). An intent not to perform may be inferred if the promisor knew or believed that he would be financially unable to perform. *Id*. "However, fraudulent intent cannot be presumed. The permissible inference will be negated where the debtor comes forward with some evidence that he did not intend to deceive the plaintiff." *Id*., *see e.g*., *Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991) (inference of intent not to perform refuted where debtor made payments on the debt for one year and only filed for bankruptcy protection when no longer able to continue making payments).

9

Finally, section 523(a)(2)(A) does not apply to representations respecting a debtor's or an insider's financial condition. Instead, a writing is required to establish such a fraudulent misrepresentation, and the elements of section 523(a)(2)(B) of the Bankruptcy Code would have to be established. As noted, Mr. Vaughn does not allege that the Debtor presented him with representations in writing.

While Mr. Vaughn references several purported misrepresentations made by the Debtor, the exception to discharge contained in section 523(a)(2) only applies to the extent that the loan was *obtained* by the false representations or fraud. Only three of the representations complained of were made prior to, or at the time of, the loan. First, Mr. Vaughn alleges that the Debtor lied about her intent to repay the loan. Second, Mr. Vaughn argues that to improve her chances of securing the loan from him, the Debtor informed him that, pursuant to a "divorce settlement stipulation[,] she was to receive monetary benefits derived from any rental income regarding a property located [in New Jersey]." [Complaint ¶ 10] Third, he asserts that the Debtor stated that she had a "substantial loan application pending that would be more than enough to repay [the loan she would get from Mr. Vaughn]."

The evidence shows that the Debtor did not have fraudulent intent when she entered into the loan agreement with Mr. Vaughn and that she did not misrepresent her intent to repay the loan. The Debtor testified that when she entered into the loan, she intended to pay Mr. Vaughn back; and, indeed, when she received payment from her clients, even though she did not have all of the money, she paid Mr. Vaughn $1,000.00. Although her financial position continued to deteriorate, she still offered to pay him the balance in $200.00 installments, which offer he refused. Moreover, the Debtor initially filed her case under chapter 13, and she testified that she

10

commenced making monthly payments under her proposed plan to the chapter 13 trustee before she found that she could no longer continue the payments and converted her case to one under chapter 7. An intent not to pay her debt to Mr. Vaughn is belied by her having paid the $1,000.00 installment toward her debt to him, having offered to pay the balance in $200.00 installments, and by commencing payments under a chapter 13 plan.

At trial, the Debtor denied making any representations about her future receipt of rental income as the result of a divorce settlement. Mr. Vaughn was not specific in identifying any precise representation of fact in this regard that he allegedly relied upon in making the loan. The loan by Mr. Vaughn had a short term (only one month) and there was no testimony that any rental income was expected in that period or could be used to repay a loan.

With respect to the "substantial loan application," the Debtor testified that, prior to borrowing the money from Mr. Vaughn, she had applied for a business loan, for which she said her accountant had informed her she was qualified. She testified that she had been working on her credit to get the loan to expand her business. She was eventually denied the loan and could not expand her business or hire new people. There is no evidence that the Debtor misrepresented the facts: she had made loan application, just as she told Mr. Vaughn. Also, there is no evidence that the Debtor did not actually believe she would get the loan. To the contrary: she was surprised and somewhat resentful when the loan was denied. Therefore, her statement was not a misrepresentation.

Accordingly, the evidence at trial does not establish grounds to deny a discharge under section 528(a)(2).

*Section 523(a)(6)*

Mr. Vaughn also asserts a claim under section 523(a)(6) of the Bankruptcy Code, which provides, in relevant part, that:

> (a) a discharge ... does not discharge an individual debtor from any debt—
> ...
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

To be considered "willful" under this section, the injury itself must be "deliberate or intentional," it is not enough that a deliberate or intentional act led to an injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). The actor must have intended "the consequences of an act, not simply the act itself." *Id.* (internal quotations and citations omitted). At a minimum, there must be "a substantial certainty that the injury will occur." *Margulies v. Hough (In re Margulies)*, 517 B.R. 441, 451 (S.D.N.Y.2014). The "malicious" factor requires that the act have been "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87-88 (2d Cir. 1996). Constructive malice can be implied from the debtor's acts and conduct under the surrounding circumstances. Id. at 88. Ordinarily, a breach of contract claim is not within the ambit of section 523(a)(6) unless independent, tortious conduct is established. *In re Mitchell*, 227 B.R. 45, 52 (Bankr. S.D.N.Y. 1998).

The willful and malicious act alleged here is that the Debtor deliberately closed her bank account at Chase bank [PX H], despite the fact that there putatively were sufficient funds in the account to pay the debt, and allegedly failed to repay the debt at times when she could have done so. [Complaint ¶¶ 34-36]. However, the evidence at trial did not show "willful" or "malicious" conduct or any tortious behavior that would justify a limitation of the discharge under section

12

523(a)(6).

In support of his allegation that the Debtor had the funds to pay the debt she owed him on or about the due date, Mr. Vaughn produced one page from each of three of the Debtor's Chase monthly bank statements for the following periods 9/12/2012-10/17/2012 [PX B]; 10/18/2012-11/19/2012 [PX C]; and 11/20/2012-12/18/2012 [PX E].  The excerpted pages from the first two bank statements showed deposits of over $19,000.00 in each case, and checks drawn of between $7,000.00 to $8,000.00; the one-page excerpt from the third bank statement showed deposits of over $15,000.00 and checks drawn of over $3,000.00.  The Debtor objected to the introduction of these single-page excerpts from each statement because they did not reflect the entire scope of withdrawals from the account, including electronic withdrawals.  Mr. Vaughn subsequently introduced the entire bank statement for the period 9/12/2012-10/17/2012 [PX AA], which included the electronic withdrawals and showed a statement ending balance of approximately $3,100.00.

With respect to the deposits into her Chase bank accounts, the Debtor testified credibly that she had high expenses; she was behind in payments; she had to pay rent on the two units, her apartment and her salon, as she was trying to maintain her business and keep a roof over her head; and that all the money that went into the bank account flowed out to maintain her declining business and her apartment.  The Debtor further testified that she closed out her Chase bank account because there had been some fraudulent activities on the account.  Concerning many of the electronic withdrawals, the Debtor testified that she had received loans as advances on merchant transactions and that the creditors automatically deducted the amounts due from her Chase bank account.  She further testified that her business got worse and she eventually was not

13

able to cover the merchant debt either, and that she also scheduled those merchant creditors as unsecured creditors on her bankruptcy petition.

Mr. Vaughn also introduced a PNC bank statement for the period from 3/4/2013-3/29/2013, showing deposits of over $20,000.00 and a closing balance of over $15,000.00 [EX L]. With respect to the funds in the PNC bank statement, the Debtor testified that those funds were not available to her; the funds were derived from subletting her residential apartment for three months while she stayed in her salon – an arrangement made with her landlord's consent – and the funds were earmarked to pay the rent.

Mr. Vaughn provided a copy of Schedule I from the Debtor's petition, which listed her monthly income as $4,494.00. [PX N] He also introduced a copy of a bank statement from TD Bank for the period from 8/14/2014-9/3/2014 [PX U], which reflected deposits of $9,230.00 and that she made a $2,600.00 rent payment. With respect to the TD Bank Statement for the August to September 2014, period, Mr. Vaughn questioned how she could afford a rent of $2,600.00 per month on a salary of $4,949.00 monthly. The Debtor indicated that she could not afford the apartment and she was not currently paying the rent.

To show discrepancies concerning the Debtor's income, Mr. Vaughn also provided copies of "1120" tax forms for the Debtor's business for the years 2011 [PX X], 2012 [PX W], and 2013 [PX V], and her individual "1040" tax form for the year 2012, which showed a business loss of $27,713. [PX Y] Upon the Court's examination of the Debtor, it became clear that the income Mr. Vaughn was attributing to the Debtor was actually business earnings before payment of expenses, such as rent and supplies. The Debtor testified that she was actually making zero income. Thus, the Debtor did not have the excess of funds that Mr. Vaughn presumed.

14

Finally, Mr. Vaughn referenced the Damage Action commenced by the Debtor seeking $500,000.00. However, the Debtor properly listed that lawsuit on her schedules, and any recovery from the Damage Action would become part of her bankruptcy estate to be distributed to creditors (including, potentially, Mr. Vaughn).

The Debtor testified credibly concerning her declining income.[7] Her business had declined; the hair extension service she provided was somewhat expensive and many of her clients had been affected by the worsening economy. The evidence shows that the Debtor did not act with the willful or malicious intent that would be required to deny a discharge under section 523(a)(6). Furthermore, the allegations and evidence amounted only to proof that the Debtor failed to repay the debt when due and thereby breached her contract with Mr. Vaughn. The failure to pay a contractual debt in the absence of tortious conduct does not fall within the ambit of section 523(a)(6).

*Section 707(b)*

Section 707(b) of the Bankruptcy Code provides, in relevant part, that

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . .

Mr. Vaughn alleged in the Complaint that, based on the information contained in the Debtor's petition and her testimony at the section 341 meeting of creditors, she had enough income after deductions to pay her debts and there was a presumption of abuse. [Complaint ¶¶ 20, 22-25 & 30] However, at trial, he withdrew that contention. In any event, Mr. Vaughn did not

---

[7] In the Complaint, Mr. Vaughn acknowledged the Chapter 7 Trustee's representation made at the March 19, 2015 pre-trial conference to the effect that the Debtor's income had dropped considerably since she first filed her bankruptcy petition. [Complaint ¶ 53].

15

establish that the Debtor's debts were primarily consumer debts; and the Debtor testified credibly that most of her debts related to her business.

*Section 727*

Mr. Vaughn also argued that the Debtor withheld pertinent information from the chapter 7 trustee and, therefore may not receive a discharge. [Complaint ¶ 31] While Mr. Vaughn did not reference a Bankruptcy Code section, this appears to be a reference to section 727(a)(2) & (4)(a) of the Bankruptcy Code, which concerns the Debtor's overall discharge. "While § 523 simply bars discharge of specific debts incurred through fraud, § 727 is a blanket prohibition of a debtor's discharge, thereby protecting the debts owed to all creditors." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1309 (2d Cir. 1996). As previously noted, Mr. Vaughn's intent in this regard, however, is not entirely clear because in a later paragraph of the Complaint, he limits the assertion to his particular debt by stating, "Concealment is a definite cause for denying the Debtor any Chapter 7 discharge relief regarding [Mr. Vaughn's] Unsecured Non-Priority *particular* debt." [Complaint ¶ 50 (emphasis added)]. In any event, for completeness, the Court will address the 727 issues.

> Section 727(a) provides, in relevant part, for a court to grant a discharge to a debtor, unless
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (C) property of the estate, after the date of the filing of the petition.
> > . . .
> (4) the debtor knowingly and fraudulently, in or in connection with the case - -

16

>  (A) made a false oath or account.

Mr. Vaughn contends that the Debtor concealed from the chapter 7 trustee information concerning the mortgage debt on the New Jersey property [Complaint at ¶¶ 29-30], and as president of Victoria Strands, Inc., failed to disclose that her company owed an outstanding balance of over $3,500 to the Daily News (the "Daily News") owing from November 30, 2009. [Complaint at ¶¶ 48-49, PX T]   He also contends that the Debtor provided false information about her lawful eviction from unit 2F. [Complaint ¶¶ 40-44]

With respect to the mortgage, the Debtor testified at trial that when her ex-husband applied for a loan modification to lower the interest rate, she was required to sign the mortgage because her name was on the deed, but she was not responsible for mortgage payments.   She further testified that when she tried to call the bank holding the mortgage to get information, the bank would not give her any information as her ex-husband was solely responsible for the mortgage debt.   It is apparent that when the Debtor testified that she was not on the mortgage at the section 341 meeting of creditors, and as she continued to maintain at the trial, what she meant was that she was not liable to pay the indebtedness that was secured by the mortgage.   A mortgage is a security interest that allows the holder to foreclose against property.   If the loan is not paid, the mortgage holder can go after the property, and giving someone a security interest in a property to secure a debt is different than owing the debt.   The Debtor testified credibly, at trial, that she did not intend to mislead anyone, the mortgage company required her to sign the actual mortgage because her name was on the deed, but she did not sign other documents presented during the transaction that would have made her responsible for the loan.   She actually believed that she was not "on the mortgage" because she thought that indicated she was liable for the debt.   The Schedules she filed referenced

17

the property and the Mortgage and did not conceal them. In context, it is clear that what she meant to convey at the section 341 meeting of creditors, and at trial, was that she did not believe she was personally liable on the indebtedness, and she did not intend to mislead anyone by her statement.

The Debtor testified that the Daily News indebtedness was based on advertising that Victoria Strands, Inc. had placed in the paper in or around 2009, and that debt was not listed on her schedules because it had been paid prior to her filing for bankruptcy protection. Mr. Vaughn insisted that the debt was still outstanding but only because the collection action commenced by the Daily News against Victoria Strands, Inc. is still open on the state court's docket, and because, in Mr. Vaughn's view, a satisfaction of judgment would have been docketed if the debt had been paid. However, there was no "judgment" in that case to be satisfied. Exhibit "T" was the summons and complaint filed in state court by the Daily News against Victoria Strands, Inc., and the Court admitted Exhibit "T" for the limited purpose of showing that the lawsuit had been filed in January 2011. Mr. Vaughn also provided a case summary of the action from the N.Y. County Civil Court, which reflected only two entries; the first, in January of 2011, was the summons and complaint, and the second, in March of 2011, was the answer. Neither exhibit evidenced the current status of the lawsuit or of the debt or showed any other activity in the case. Indeed, the case summary only reflected that the Daily News had not pursued the action, as it had been dormant for several years. At trial, the Debtor testified that she paid the amount of that debt to an attorney who represented her in the collection matter, and that, in turn, the attorney's office had paid the Daily News debt from its escrow account. In support, the Debtor presented a copy of a June 22, 2015 email exchange between her and a paralegal from the office of her former attorney

18

that verified that the attorney had issued three checks to the Daily News in 2011 to satisfy that debt. [DX 8]. Thus, it appears that the debt was paid. At a minimum, the Debtor believes the debt was paid and, therefore, she did not conceal this debt

Finally, with respect to the eviction from unit 2F, Mr. Vaughn says that the Debtor falsely testified at the section 341 meeting of creditors that she vacated the commercial space because of landlord harassment when in reality it was a lawful eviction for non-payment of rent. The Debtor testified that certain disruptions to her business occurred, such as some tampering with her telephone lines, and she believes that the disruptions were caused by employees of her former landlord, at the same time that her former landlord was trying to sell the building. She testified that she believed that they were trying to get her out of the property. She also testified concerning entering into the Stipulation of Settlement with the landlord [DX 2], agreeing to vacate unit 2F. In addition, she testified concerning a mold inspection [DX 4] that she commissioned after sustaining the water damage, and the filing of the Damage Action. Regardless of whether there was harassment, the Debtor believes that her former landlord's employees, at his instigation, were interfering with her business and, therefore, she did not provide false information on that account.

*Conclusion*

Mr. Vaughn's first claim for relief is dismissed. The relief sought in the second claim for relief, pursuant to section 523(a)(2) and (6) of the Bankruptcy Code seeking to have his claim

against the Debtor's declared a non-dischargeable debt, is denied. To the extent Mr. Vaughn sought a declaration denying the Debtor a discharge under 727 of the Bankruptcy Code, that application also is denied. The Debtor is entitled to a discharge of her debts and a fresh start. Accordingly, her section 727 discharge should be entered forthwith.

Dated: New York, New York
      July 15, 2015

                                            **s/Michael E. Wiles**
                                            UNITED STATES BANKRUPTCY JUDGE